**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SONYA F. LEVY, *on behalf of herself and all others similarly situated*, <br><br>                  Plaintiff, <br><br> v. <br><br> HU PRODUCTS LLC, HU MASTER HOLDINGS LLC, and MONDELEZ GLOBAL LLC, <br><br>                  Defendants. | Case No. 1:23-cv-01381-AT <br><br> Honorable Analisa Torres <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Sonya F. Levy ("Plaintiff") brings this class action lawsuit in her individual capacity as well as on behalf of all others similarly situated against Hu Products LLC, Hu Master Holdings LLC, and Mondelez Global LLC (collectively, "Hu" or "Defendants"), and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.  This action seeks to remedy the deceptive and misleading business practices of Hu with respect to the marketing and sale of Hu's Organic Simple Dark Chocolate 70% Cocoa chocolate bars (hereinafter, the "Products") throughout the State of New York and the country.

2.  Defendants do not disclose that the Products contain lead, which is an extremely dangerous and harmful chemical when consumed, especially by pregnant women and children.

3.  Scientists agree that there is *no* level of lead that is safe; according to the Mayo Clinic, "[l]ead poisoning occurs when lead builds up in the body, often over months. or years. Even small amounts of lead can cause serious health problems. Children younger than 6 years are

especially vulnerable to lead poisoning, which can severely affect mental and physical development. At very high levels, lead poisoning can be fatal."[1]

4.    *Consumer Reports* Magazine and independent testing uncovered that many chocolate products contained high levels of lead, as well as the dangerous chemical cadmium.[2]

5.    Using California's Maximum Allowable Dose Level (MADLs) for lead (0.5 Micrograms) and cadmium (4.1mcg), *Consumer Reports* found that Hu's Organic Simple Dark Chocolate 70% Cocoa Product contained 210% of the MADL of lead.[3] California's MADLs (otherwise known as Proposition 65) is a regulatory standard for chemicals causing reproductive toxicity.[4]

6.    Defendants' marketing and advertising campaign includes the one place that every consumer looks when deciding whether to purchase a product – the packaging and labels themselves.

7.    Defendants' advertising and marketing campaign for the Products is false, deceptive, and misleading because it does not disclose the high levels of lead in the Products.

8.    The presence of lead, particularly in high or elevated levels, in food products is unquestionably material to reasonable consumers, because the chemical poses serious health risks, even in small dosages. In addition, the lead levels in the Products could not be known before purchasing them, and may not be determined without extensive and expensive scientific testing.

---

[1] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717

[2] https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/

[3] *Id.*

[4] https://oehha.ca.gov/proposition-65/general-info/current-proposition-65-no-significant-risk-levels-nsrls-maximum

9.    Accordingly, consumers understandably and justifiably rely on Defendants to be truthful regarding the ingredients, including the presence of dangerous chemicals like lead and cadmium, in the Products.

10.    On the other hand, Defendants knew and could not be unaware of the existence of lead in the Products. Defendants source the ingredients and manufacture the Products, and have exclusive knowledge of the quality control testing on the Products and the ingredients contained therein.

11.    Plaintiff and those similarly situated (the "Class Members") relied on Defendants' misrepresentations and omissions that the Products contained only dark chocolate ingredients when purchasing the Products.

12.    Had they known the truth about Defendant's Products, Plaintiff and all others similarly situated would not have purchased them or would have paid less than they did for them.

13.    Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350. Defendants also breached and continue to breach their warranties regarding the Products. Accordingly, Plaintiff brings this action against Defendants on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## PARTIES

### *Plaintiff*

14.    Plaintiff Sonya Levy is an individual consumer who, at all times material hereto, was a citizen of the State of New York, residing in New York County, New York. Plaintiff purchased and consumed the Products in New York multiple times during the Class Period, almost on a weekly basis. Prior to purchasing the Products, Plaintiff always reviewed the Products' labels,

especially the packaging. Plaintiff purchased the products in various stores in New York City, including but not limited to, Whole Foods, Fairway Market, and Westside Market NYC.

15.    Plaintiff purchased the Products in reliance on Defendants' representations that the Products contained only the dark chocolate ingredients that were "simple" and "clean" and were safe for consumption.  If the Products did not contain lead, Plaintiff would purchase the Products in the immediate to near future.

16.    The most recent time Plaintiff purchased and consumed the Products was in September 2022.

17.    Had Defendants disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products and/or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid. Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

***Defendants***

18.    Defendant Hu Master Holdings, LLC is a New York corporation with its principal place of business in New York, NY.

19.    Defendant Hu Products LLC is a Delaware corporation with its principal place of business in New York, NY.

20.    Defendant Hu Master Holdings, LLC, is the parent of Defendant Hu Products LLC.

21.    Upon information and good faith belief, Defendants are authorized to do business in New York.

22.    Hu Master Holdings is a food and beverage company with a line of "premium"

snacks and chocolate products, including the Products, purchased by Plaintiff and Class Members, which are available at retail stores and online throughout New York and the United States.

23.    Defendant Mondelez Global LLC is a Delaware corporation with its principal place of business in Chicago, IL.  Defendant Mondelez acquired Defendant Hu Master Holdings in 2021.

24.    Defendants manufacture, market, advertise, and distribute the Products throughout the United States. Defendants created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

## JURISDICTION & VENUE

25.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), in that: (1) this is a class action involving more than 100 class members and at least one class member is a citizen of a state different from at least one Defendant; and (2) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

26.    Defendants are "unincorporated associations" under CAFA, and Defendants are therefore "a citizen of the State where it has its principal place of business and the State under whose laws it is organized."  See 28 U.S.C. § 1332(d)(10).

27.    This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of New York, and contract to supply goods within the State of New York, such that they have continuous and systematic contacts with the State of New York. Further, Defendants Hu Master Holdings and Hu Products both reside in the State of New York.

28.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

29.    Consumers have become increasingly concerned about the effects of unhealthy

chemicals in food products that they and their family members consume. As noted in the Consumer Reports Article, consumers "choose dark chocolate in particular for its potential health benefits, thanks to studies that suggest its rich supply of antioxidants may improve heart health and other conditions, and for its relatively low levels of sugar." A recent survey from the National Confectioners Association, referenced in the Consumer Reports Article, found that more than half of the survey participants described dark chocolate as a "better for you" candy. Companies, such as Defendants, have capitalized on consumers' desire for safe products, and indeed consumers are willing to pay, and have paid, a premium for such food products.

30.    Consumers lack the meaningful ability to test or independently verify whether a product contains lead or other unsafe and unhealthy substances, especially at the point of purchase.

31.    Therefore, consumers must and do rely on Defendants to truthfully and honestly report what their Products contain on their packaging or labels. Indeed, testing for these chemicals requires expensive and destructive scientific testing. Given the relatively low price of the Products, no reasonable consumer would engage in such testing before purchasing the Products.

32.    However, public reports and articles recently revealed that Defendants' Products contain unsafe levels of lead. Indeed, these levels of lead exceed the MADLs for this chemical by 110 percent, posing serious health risks. Despite these risks, Defendants failed to include any disclosures regarding lead levels on its Products.

33.    For instance, in December 2022, Consumer Reports published a blockbuster report detailing the prevalence of Heavy Metals in dark chocolate products. Consumer Reports tested 28 dark chocolate bars for lead and cadmium from a variety of brands.

34.    The report found that Defendants' Product has excessively high levels of lead,

6

which is extremely toxic. "No amount of lead is known to be safe,"[5] and its harmful effects cannot be reversed or remediated.[6]

35.    Exposure to lead can result in neuropathy and brain damage, hypertension, decreased renal function, increased blood pressure, and gastrointestinal and cardiovascular effects, and can also cause reduced fetal growth or lower birth weights in pregnant women.[7]

36.    Lead is a carcinogen and lead exposure can seriously harm the brain and nervous system in children. Lead is also associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

37.    Exposure to lead in foods builds up over time.  Lead build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

38.    Even very low exposure levels to lead can "cause lower academic achievement, attention deficits, and behavior problems.  No safe level of exposure has been identified."[8]

---

[5] *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR, Aug. 13, 2016, available at https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epalimits-can-still-impact-your-health (last accessed May 11, 2023).

[6] *Heavy Metals in Baby Food: What You Need to Know*, Consumer Reports, Aug. 16 2018 (updated Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed May 11, 2023).

[7] *What are Possible Health Effects from Lead Exposure?* Agency for Toxic Substances and Disease Registry, available at https://www.atsdr.cdc.gov/csem/leadtoxicity/physiological_effects.html (last accessed May 11, 2023).

[8] Healthy Babies Bright Futures Report at 18; *see also* House Report at 11.

39.    "[A]ny cadmium exposure should be avoided."[9]  Exposure to even low levels of cadmium over time may build up cadmium in the kidneys and cause kidney disease and bone loss.[10]

40.    Cadmium exposure can affect the gastrointestinal system, as well as lead to hemorrhagic gastroenteritis, liver and kidney necrosis, cardiomyopathy, and metabolic acidosis.[11]

41.    Exposure to cadmium is also linked to cardiovascular disease and cancer.[12]

42.    Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children."[13]

43.    Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[14]  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[15]

---

[9] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection*? Environmental Health Perspectives, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed May 11, 2023).

[10] *Id.*

[11] *Cadmium Toxicity: What Health Effects are Associated with Acute High-Dose Cadmium Exposure?* Agency for Toxic Substances and Disease Registry, available at https://www.atsdr.cdc.gov/csem/cadmium/Acute-Effects.html (last accessed May 11, 2023).

[12] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection?* Environmental Health Perspectives, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed May 11, 2023).

[13] *Is Homemade Baby Food Better? A New Investigation: Tests Compare Toxic Heavy Metal Contamination in Homemade Versus Store-Bought Foods for Babies*, Healthy Babies Bright Futures, Aug. 2022, at 69 ("Healthy Babies Bright Futures Report"), available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2022-08/StoreVsHomemade_2022.pdf (last accessed May 11, 2023).

[14] *Id.*

[15] *Public Health Statement for Cadmium*, Agency for Toxic Substances and Disease Registry, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed May 11, 2023).

44.     Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequester[s] in [human] tissue."[16]

45.     The Consumer Reports Article warned consumers that dark chocolate tends to be higher in heavy metals than milk chocolate, likely because of its higher cacao content.[17] "[C]acao plants take up cadmium from the soil, with the metal accumulating in cacao beans as the tree grows."[18] Lead on the other hand appears to get into cacao after the cacao beans are harvested.[19]

46.     The Consumer Reports Article identified potential solutions to minimize or omit the presence of lead in cacao, including changes in harvesting and manufacturing practices.[20] Such practices include "minimizing soil contact with [cacao] beans as they lie in the sun, and drying beans on tables or clean tarps away from roads or with protective covers, so lead-contaminated dust won't land on [the cacao beans]."[21] Another option is implementing procedures and/or methods to remove metal contaminants when beans are cleaned at factories.[22]

47.     The Consumer Reports Article noted that "while most of the chocolate bars in CR's tests had concerning levels of lead, cadmium, or both, five of them were relatively low in both," showing it is possible to make products with lower amounts of heavy metals.[23] Furthermore, the

---

[16] Stephen J. Genius et al., *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*, PLOS ONE, Nov. 21, 2012, available at https://doi.org/10.1371/journal.pone.0049676 (last accessed May 11, 2023).

[17] Consumer Reports Article.

[18] *Id.*

[19] *Id*.

[20] *Id*.

[21] *Id*.

[22] *Id*.

[23] *Id*.

Consumer Reports Article continued to say that "while contamination with heavy metals is common, *it is not inevitable*."[24]

48.    In addition, as a result of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[25]  These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[26]  The progress towards decreasing childhood exposure to lead was so impressive that the Centers for Disease Control and Prevention ("CDC") identified "childhood lead poisoning prevention as 1 of 10 great US public health achievements during 2001 to 2010."[27]

49.    Defendants knew and could not have been unaware of the lead in the Products.

50.    By law, Defendants have a responsibility to implement controls to significantly minimize or prevent exposure to chemical hazards in the Products. Defendants manufacture and source the ingredients contained within the Products.

51.    Defendants test the Products for quality control purposes, including the levels of toxic chemicals such as lead contained therein.

52.    In addition, Defendants receive Certificates of Analysis and other certifications from the suppliers of the ingredients used to create the Products. These documents will also disclose the levels of chemicals, such as lead, contained in each constituent ingredient.

53.    Upon information and belief, these documents and their own testing alerted

---

[24] *Id*. (emphasis added).

[25] Timothy Dignam et al., *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure,* Journal of Public Health Management and Practice, Jan.-Feb. 2019, available at  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed May 11, 2023).

[26] *Id*.

[27] *Id*.

Defendants to the present of harmful chemicals, such as lead, in the Products.

54.    Accordingly, Defendants had exclusive knowledge of the lead levels in the Products, and Plaintiff and the Class Members could not have known about this risk.

55.    Consumers reasonably rely on the marketing and information on Defendants' labels in making purchasing decisions. By marketing the Products as containing only dark chocolate ingredients, and not disclosing the presence of lead, Defendants mislead reasonable consumers.

56.    Despite Defendants' knowledge of lead in the Products, Defendants failed to provide any warning on the place that every consumer looks when purchasing a product—the packaging or labels—that the Products contain lead.

57.    In fact, Defendants' success as a "health and wellness" snack brand rests on their numerous representations that their products are "better-for-you," "clean," "organic," and made with "simple, close to nature ingredients" – in contrast to their presumably unhealthy "competition."[28]

58.    Defendants tout their commitment to a healthy lifestyle and their "strict ingredient guardrails" as the reason and motivation that led them to start their own company:

> We couldn't find a chocolate that met our standards. So we made our own.
>
> …
>
> The [Hu founders] experimented and researched the gut-brain connection, the causes of systemic inflammation, and the impact of certain foods and additives on our health, immunity, and performance. When all was said and done, the answer was pretty clear: replacing weird, industrial ingredients with simple, healthier ones was the key to thriving, not just surviving. Motivated by their

---

[28] *See* https://hukitchen.com/pages/about-us#/; https://hukitchen.helpdocs.io/article/k35mbhwsxm-are-all-of-your-products-organic; https://hukitchen.helpdocs.io/article/i0txm3ql16-what-makes-your-chocolate-clean  (last accessed Jan. 24, 2023).

health and wellness learnings, they set out to create a food brand that brought to life their newfound passion and human-centric philosophy.

…

WE OBSESSIVELY VET EVERY INGREDIENT TO UNITE UNBEATABLE TASTE WITH UNMATCHED SIMPLICITY.[29]

59.     Defendants' packaging for the Simple Organic Dark Chocolate 70% Cacao bar lists only three ingredients: "organic fair-trade cacao, unrefined organic coconut sugar, organic fair-trade cocoa butter."

60.     Defendants' packaging for the Simple Organic Dark Chocolate 70% Cacao bar also has a long list of presumably unhealthy ingredients which allegedly the Product does not contain:



*Figure 1. Front of Defendants' Simple Dark Chocolate Organic 70% Cacao bar.*

---

[29] *See id.*

61.     Ironically, as opposed to sugar or palm oil, lead – which the Product does contain – is not safe in any amount.

62.     Likewise, the back of the Product's packaging does not reveal it contains lead or other unhealthy ingredients:



*Figure 2. Back of Defendants' Simple Dark Chocolate Organic 70% Cacao bar.*

//

//

//

//

//

//

63.     Defendants further represented that their Products do not contain any "weird ingredients":



*Figure 3. Part of Defendants' ad for its Products.*

64.     Defendants' concealment that their Products contain toxic heavy metals was material because people are understandably concerned with what is in the food that they are putting into their bodies, as well as parents and caregivers being concerned with what they are feeding to the children in their care.

65.     Defendants were aware of those concerns and played upon them when they presented their Products as containing only "simple," "healthy" ingredients.

66.     Consumers such as Plaintiff and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the food packaging they buy.

67.     Defendants know that if they had not omitted that the Products contained lead and that the Products were not safe or healthy for consumption then Plaintiff and the Class would not have paid a premium for the Products (or purchased them at all).

68.     Plaintiff and the Class Members reasonably relied to their detriment on Defendants' misleading representations and omissions.

69.    Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

70.    In making the false, misleading, and deceptive representations and omissions described herein, Defendants knew and intended that consumers would pay a premium for the Products. Had Defendants not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

71.    Plaintiff and the Class Members each paid money for the Products; however, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendants' misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendants' wrongful conduct.

## TOLLING

72.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that the Products contained toxic heavy metals because Defendants kept this information secret.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings her claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class (collectively "the Class"):

All consumers who purchased the Products anywhere in the United

States during the relevant statute of limitations.

74.    In addition, or in the alternative, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of herself and all members of the "New York Subclass," which shall initially be defined as:

> All consumers who purchased the Products in the State of New York
> at any time during the relevant statute of limitations.

75.    Excluded from the Class is governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

76.    The Class and New York Subclass are properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

77.    **Numerosity:** Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers in the Class and the New York Subclass who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

78.    **Commonality:** The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

> a.    Whether Defendants are responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased their Products;

    b.   Whether the Products contain lead;

    c.   Whether Defendants breached express and implied warranties relating to the Products;

    d.   Whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants had engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

    e.   Whether Defendants' false and misleading statement concerning their Products were likely to deceive the public and

    f.   Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

79.    **Typicality:** Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class and New York Subclass was susceptible to the same deceptive, misleading conduct and purchased Defendants' Products and suffered the same injury. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

80.    **Adequacy:** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seeks to represent, she has a strong interest in vindicating her rights and the rights of the Class and New York Subclass, he has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

81.    **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class and New York Subclass. The Class and New York Subclass issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading marketing and labeling practices.

82.    **Superiority:** A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.    The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c.    When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.    It would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendants' uniform false advertising to purchase their Products because they contain dark chocolate ingredients and not lead.

83.    Accordingly, this Class and New York Subclass are properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to

Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.[30]

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
#### (On Behalf of Plaintiff and All Class Members)

84.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

86.    This claim is brought pursuant to the laws of the State of New York.

87.    Defendants are merchants and were at all relevant times involved in the manufacturing, distributing, and/or selling of the Products.

88.    The Products are considered a "good" under the relevant laws.

89.    UCC § 2-313 provides that an express warranty is created when a seller makes: (a) any affirmation of fact or promise which relates to the goods and becomes part of the basis of the bargain; (2) any description of the goods which is made part of the basis of the bargain; or (3) any sample or model which made part of the basis of the bargain.

90.    Defendants expressly warranted through their public advertising and packaging, which presented the Products as free of "weird ingredients," and many other representations of purity and quality control, including their numerous representations that their products are "better-

---

[30]  Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

for-you," "clean," "organic," and made with "simple, close to nature ingredients."

91.     These warranties assured Plaintiff and the other Members of the Class that the Products would be free of "weird ingredients" such as lead, and became the basis for the bargain in that Plaintiff and the other Members of the Class would not have purchased the Products or would have paid less for them than they did had they known the truth about Defendants' Products.

92.     Defendants breached their express warranties because the Products did in fact contain lead.

93.     As a direct and proximate result of Defendant's breach of express warranty Plaintiff and the other Members of the Class were injured in the amount of the price they paid for the Products, in an amount to be proven at trial.

94.     Defendants have been provided sufficient notice of their breach of express warranties associated with the Products. Defendants were put on constructive notice of their breaches through media reports, as alleged herein, and upon information and belief, through their own product testing and records.

95.     Further, on February 9, 2023, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a warranty notice letter that complied in all respects with U.C.C. 2-607. The letter provided notice of breach of express warranties.  The letter advised Defendants that they were in violation of the U.C.C. 2-607 and demanded that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.  A true and correct copy of that letter is attached hereto as **Exhibit 1**.

**COUNT II**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff and New York Subclass Members)**

96.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

97.    Plaintiff brings this claim individually and on behalf of the New York Subclass Class against Defendants.

98.    This claim is brought pursuant to the laws of the State of New York.

99.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

100.    Defendants committed deceptive acts and practices by employing false, misleading, and deceptive representations and/or omissions about the presence (or potential presence) of toxic heavy metals in its Products.

101.    Information as to the heavy metal content of each of its dark chocolate Products was in Defendants' exclusive control.  Plaintiff could not possibly have known that the Products at issue contained toxic heavy metals because such information was not available to the public until late 2022.

102.    Defendant's deceptive acts and practices were directed at consumers.

103.    Defendants' deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were safe to consume regularly and did not contain significantly elevated levels of toxic heavy metals.

104.     Defendants know that health information about its food products is material to consumers.  If such information were not material, Defendants would not market their Products as containing "no weird ingredients."  As a result of its deceptive acts and practices, Defendants sold tens if not hundreds of thousands of dark chocolate Products to unsuspecting consumers across New York.

105.     If Defendants had advertised the Products truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased them or would not have paid as much as they did for them.

106.     As a direct and proximate result of Defendants' false, misleading, and deceptive representations and/or omissions, Plaintiff and other Members of the New York Subclass were injured in that would not have purchased the Product, or would have paid substantially less for it, but for Defendants' misrepresentations and omissions concerning the heavy metal content in the Products.

107.     On behalf of herself and Members of the New York Subclass, Plaintiff seeks to recover her actual damages or fifty (50) dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT III**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the New York Subclass Members)**

108.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

109.     Plaintiff brings this claim individually and on behalf of the New York Subclass Class against Defendants.

110.     This claim is brought pursuant to the laws of the State of New York.

111.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows: False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

112.    N.Y. Gen. Bus. Law § 350-A(1) provides, in part, as follows: "The term 'false advertising,' means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representation made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual."

113.    Defendants' labeling and advertisements contain untrue and materially misleading statements concerning Defendants' Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendants' marketing and labeling misleads a reasonable consumer.

114.    Defendants had exclusive knowledge of the lead levels in the Products.

115.    Defendants' misrepresentations and omissions were material because consumers are concerned with the safety of food that they purchase, and the ingredients therein.

116.    As a result of Defendant's misrepresentations and omissions, Plaintiffs and members of the Class and Subclasses have suffered economic injury because they would not have purchased the Products, or would have paid substantially less for it, if they had known that the Products contained heavy metals.

117.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

118.    As a result of Defendants' recurring, unlawful deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory damages of $500 per unit sold, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and All Class Members in the Alternative)**

119.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

120.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

121.    This claim is brought pursuant to the laws of the State of New York and in the alternative.

122.    Defendants' conduct violated, inter alia, state and federal law by manufacturing, advertising, marketing, and selling its Products while misrepresenting and omitting material facts.

123.    Defendants' unlawful conduct as described in this Complaint allowed Defendants to knowingly realize substantial revenues from selling their Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members, and to Defendants' benefit and enrichment. Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

124.    Plaintiff and Class Members conferred significant financial benefits and paid

substantial compensation to Defendants for the Products, which were not as Defendants represented them to be.

125.    It is inequitable for Defendants to retain the benefits conferred by Plaintiff and Class Members' overpayments.

126.    Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order certifying the Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class and the New York Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and the New York Subclass;

(b)    For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the New York Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest in all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For an order awarding Plaintiff, the Class, and the New York Subclass their reasonable attorney's fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable of right.

Dated: July 3, 2023

Respectfully submitted,

By: */s/ Max S. Roberts*
    Max S. Roberts

**BURSOR & FISHER, P.A.**
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher*
Luke Sironski-White*
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        lsironski@bursor.com

**LAUKAITIS LAW LLC**
Kevin Laukaitis*
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 789-4462
E-mail: klaukaitis@laukaitislaw.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida (*Pro Hac Vice*)
Elena A. Belov (*Pro Hac Vice*)
849 W. Webster Avenue
Chicago, IL 60614
Telephone: (312) 576-3024
E-mail: david@almeidalawgroup.com
        elena@almeidalawgroup.com

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff*

26