## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SONYA F. LEVY, *on behalf of herself and all others similarly situated,*<br><br>                                        Plaintiff,<br><br>    v.<br><br>HU PRODUCTS LLC, HU MASTER HOLDINGS LLC, and MONDELEZ GLOBAL LLC,<br><br>                                        Defendants. | Case No. 1:23-cv-01381-AT<br><br>Honorable Analisa Torres<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sonya F. Levy ("Plaintiff") brings this class action lawsuit on behalf of herself and all others similarly situated against Hu Products LLC, Hu Master Holdings LLC, and Mondelez Global LLC (collectively, "Hu" or "Defendants"), and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This action seeks to remedy Hu's deceptive and misleading business practices concerning the marketing and sale of its Organic Simple Dark Chocolate 70% Cocoa chocolate bars[1] (hereinafter, the "Products," or, the "Chocolate Bars") throughout the State of New York and

---

[1] This includes the following flavors: (1) Salty; (2) Hazelnut Butter; (3) Cashew Butter + Pure Vanilla Bean; (4) Almond butter + Puffed Quinoa; (5) Crunchy Mint; (6) Cashew Butter + Raspberry; (7) Vanilla Crunch; (8) Simple; (9) Cashew Butter + Orange Vanilla; (10); Almond Crunch; and (11) Hazelnut coffee.  All of Hu's Products are derived from the same base recipe ████████████████████████████████ (**Exhibit B**: MDLZ-000001447 at slide 10). ████

████ *Id.* Slide 5.  Because all of Hu's Dark Chocolate Bars use the same base recipe with the

the country.

2.      Defendants manufacture and sell what they call ██████████ high-quality dark Chocolate Bars.  Defendants market the Products toward specific, thoroughly studied, groups of consumers.  These consumers make up the bulk of Defendants' customer base and are targeted by Defendants as ideal consumers because ████████████████████████████████ ██████████████████████

3.      Hu has conducted extensive market research ██████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████[2] Defendants continued to represent to its consumers that its Products met their health preferences while failing to disclose that Hu Dark Chocolate Bars contain significant and avoidable levels of lead, an extremely dangerous and harmful chemical when consumed, especially by pregnant women and children.

4.      Scientists agree that there is *no* level of lead that is safe. According to the Mayo Clinic, "[l]ead poisoning occurs when lead builds up in the body, often over months or years.  Even small amounts of lead can cause serious health problems.  Children younger than 6 years are especially vulnerable to lead poisoning, which can severely affect mental and physical

---

same starting ██████████████, they have roughly similar heavy metal contents and are substantially similar for purposes of this action.

[2] **Exhibit C:** MDLZ-000006656 at slide 5.

development.   At very high levels, lead poisoning can be fatal."[3]

5.    Lead is found in many foods, but concentrations can vary greatly.  Unfortunately, dark chocolate can contain more lead than nearly any other food.  In a study comparing 300 different foods, the FDA found that dark chocolate had the *third-highest concentrations* of lead and cadmium.[4]  Cocoa powder took the second spot.

6.    Testing conducted by Consumer Reports and others have borne this out, with results showing that dark chocolate products contained high levels of lead, as well as the dangerous chemical cadmium.[5]

7.    Under California's Proposition 65, which sets California's regulatory standard for chemicals known to cause reproductive toxicity, the Maximum Allowable Dose Level (MADLs) for lead is 0.5 Micrograms ("mcg").  Similarly, the maximum allowable dose of cadmium is 4.1mcg.[6]  Alarmingly, Consumer Reports found that Hu's Organic Simple Dark Chocolate 70% Cocoa Product contained 210% of the MADL of lead.[7]  While California's Proposition 65 does

---

[3]  Mayo Clinic Staff, *Lead Poisoning*, MAYO CLINIC (Jan. 21, 2022) *available* https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717 (last accessed Oct. 12, 2023).

[4] U.S. Food and Drug Administration, *FDA Total Diet Study FY 2018-FY 2020 Report Supplement: Summary of Analytical Results*, U.S. F.D.A. (July 15, 2022) *available* https://www.fda.gov/food/fda-total-diet-study-tds/fda-total-diet-study-tds-results (last accessed Oct. 12, 2023).

[5] Kevin Loria, *Lead and Cadmium Could Be in Your Dark Chocolate*, Consumer Reports (Dec. 15, 2022) *available* https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/ (last accessed Oct. 12, 2023).

[6] California Office of Environmental Health Hazard Assessment, *Proposition 65 No Significant Risk Levels (NSRLs) and Maximum Allowable Dose Levels (MADLs)*, (Sep. 1, 2023) *available* https://oehha.ca.gov/proposition-65/general-info/current-proposition-65-no-significant-risk-levels-nsrls-maximum (last accessed Oct. 12, 2023).

[7] Kevin Loria, *supra* note 4.

not control in New York, it serves as a useful reference.

8.    Further, Hu's internal testing found ███████████████████████████

███████████████████████████    Yet, despite knowing that the lead content of the

Products—no matter the level—would be material to Defendants' █████████████ health-

conscious consumers, Defendants failed to disclose this fact.

9.    Accordingly, Defendants' advertising and marketing for the Products is false,

deceptive, and misleading because they do not disclose the high or potentially high levels of lead

and heavy metals in its Products, which it knows or reasonably should know, is material to its

targeted consumer base.

10.    The presence, or risk thereof, of lead in food products, particularly in high levels,

is unquestionably material to reasonable consumers, because the metals and chemicals pose serious

health risks, even in small dosages.  This is especially true for Hu's █████████████ customer

base who are identified by Hu precisely because █████████████████████████████

███████████████████████████

11.    Consumers had no way of knowing how much lead was potentially present in the

Products before purchasing them as such information could not be determined without extensive

and expensive scientific testing.

12.    Accordingly, consumers understandably and justifiably relied on Defendants to be

truthful regarding the ingredients in their Chocolate Bars, including disclosing whether lead may

be present.

13.    Plaintiff and those similarly situated relied on Defendants' misrepresentations and

omissions that the Products contained high-quality, safe dark chocolate ingredients, and the lowest

possible amount of lead, when purchasing the Products.

14.     Had consumers known the truth about Defendants' Products, Plaintiff and all others similarly situated would not have purchased them or would have paid less than they did for them.

15.     Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350.  Defendants also breached and continue to breach their express warranties regarding the Products.  Lastly, Defendants' conduct constitutes fraud.  Accordingly, Plaintiff brings this action against Defendants on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## PARTIES

### *Plaintiff*

16.     Plaintiff Sonya Levy is an individual consumer who, at all relevant times was a citizen of New York, residing New York County.   In September 2022, Plaintiff purchased and consumed, at minimum, the Almond + Puffed Quinoa, Salty, and Cashew Product flavors.  Plaintiff made these purchases in New York multiple times during the Class Period, almost on a weekly basis.   Prior to purchasing the Products, Plaintiff reviewed the Products' labels and packaging.  Plaintiff purchased the products in various stores throughout New York City, including but not limited to, Whole Foods, Fairway Market, and Westside Market NYC.

17.     Plaintiff purchased the Products in reliance on Defendants' representations that the Products contained only the dark chocolate ingredients that were "simple" and "clean" and safe for consumption.  Based on Defendants' representations, Plaintiff believed that the Products were produced to the highest health standards and contained the least amount of lead possible.

18.     Had Defendants disclosed that the Products contained lead, Plaintiff would not have paid the same amount for the Products and/or would not have been willing to purchase the

Products.  Plaintiff purchased and paid more for the Products than she would have as a result of Defendants' misrepresentations and omissions concerning the lead content of the Products. Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

***Defendants***

19.    Defendant Hu Master Holdings, LLC is a New York corporation with its principal place of business in New York, NY.  Hu Master Holdings, LLC is the parent of Defendant Hu Products LLC.

20.    Defendant Hu Products LLC is a Delaware corporation with its principal place of business in New York, NY.

21.    Hu Master Holdings LLC is a food and beverage company with a line of "premium" snacks and chocolate products, including the Products, purchased by Plaintiff and Class Members, which are available at retail stores and online throughout New York and the United States.

22.    Defendant Mondelez Global LLC is a Delaware corporation with its principal place of business in Chicago, Illinois.  Defendant Mondelez acquired Defendant Hu Master Holdings in 2021.

23.    Defendants manufacture, market, advertise, and distribute the Products throughout the United States and the State of New York.  Defendants created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

## JURISDICTION & VENUE

24.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), in that: (1) this is a class action involving more than 100 class members and at least one class member is a citizen of a state different from at least one Defendant; and (2) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

25.     Defendants are "unincorporated associations" under CAFA, and Defendants are therefore "citizen[s] of the State[s] where [they] ha[ve] [their] principal place[s] of business [New York and Delaware] and the State[s] under whose laws [they are] organized [New York and Illinois]."  See 28 U.S.C. § 1332(d)(10).

26.     This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of New York, and contract to supply goods within the State of New York, such that they have continuous and systematic contacts with the State of New York. Further, Defendants Hu Master Holdings and Hu Products both reside in the State of New York.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I.    Lead and Its Effects on the Body

28.     Consumers have become increasingly concerned about the effects of unhealthy chemicals in food products that they and their family members consume.  In fact, "[f]or the eighth year in a row, consumers rated chemicals as their top food safety concern according to the annual industry survey of consumer perspectives on food issues."[8]  When it comes to dark chocolate, one major chemical of concern is lead.

29.     The effects of lead are not immediately experienced.  Often, lead in food accumulates in the body through the course of repeated ingestion.

30.     Lead exposure can cause neuropathy, brain damage, hypertension, decreased renal

---

[8] Tom Neltner, *Consumers Continue To Rate Chemicals In Food As A Top Food Safety Concern*, ENVIRONMENTAL DEFENSE FUND (Sep. 14, 2022), https://blogs.edf.org/health/2022/09/14/consumers-continue-to-rate-chemicals-in-food-as-top-food-safety-concern/ (last accessed Oct. 17, 2023).

function, increased blood pressure, gastrointestinal and cardiovascular effects, reduced fetal growth, and lower birth weights in pregnant women.

31.    The effects of lead exposure in children can be even more severe. Lead has been shown to harm brain and nervous system function and development in children. Even at low levels, lead ingestion is associated with behavioral problems, decreased cognitive and educational performance, hypertension, and anemia in children.

32.    Accordingly, "[n]o amount of lead is known to be safe," and its harmful effects cannot be reversed or remediated. In fact, "[n]o safe level of exposure has been identified."

33.    Although lead is both common and naturally occurring, "it is not inevitable."[9] Consumer Reports has identified several solutions to minimize or eliminate the presence of lead in cacao, including changes in harvesting and manufacturing practices.[10] Such practices include "minimizing soil contact with [cacao] beans as they lie in the sun, and drying beans on tables or clean tarps away from roads or with protective covers, so lead-contaminated dust won't land on [the cacao beans]."[11] In addition, cacao beans can be cleaned of heavy metal contaminants in the factory.[12]

34.    To that point, public health efforts have been successfully decreasing lead exposure over the past 40 years.[13] These efforts include increasing awareness of the dangers of even low

---

[9] Kevin Loria, *supra* note 4.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Timothy Dignam et al., *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure,* J. of Pub. Health Mgmt. and Prac. Jan.-Feb. 2019, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed May 11, 2023).

levels of lead exposure to young children.[14]  In fact, the progress was so remarkable that the Centers for Disease Control and Prevention ("CDC") called "childhood lead poisoning prevention [] 1 of [the] 10 great[est] US public health achievements" of the first decade of the 2000s.[15]

## II.    Consumer Reports ████ Find Lead In The Products

35.    In December 2022, Consumer Reports published a blockbuster report detailing the prevalence of Heavy Metals in dark chocolate products.  Consumer Reports tested 28 dark chocolate bars for lead and cadmium from a variety of brands.  The report found that Defendants' Simply Dark 70% Dark Chocolate Bar has excessively high levels of lead, which is extremely toxic.

36.    The Consumer Reports article warned consumers that dark chocolate tends to be higher in heavy metals than milk chocolate, likely because of its higher cacao content.[16]  "[C]acao plants take up cadmium from the soil, with the metal accumulating in cacao beans as the tree grows."[17]  Lead on the other hand appears to get into cacao after the cacao beans are harvested.[18]

37.    Moreover, Consumer Reports' findings demonstrated that "while most of the chocolate bars in CR's tests had concerning levels of lead, cadmium, or both, five of them were relatively low in both," showing it is possible to make products with lower amounts of heavy metals.[19]

38.    In its Article, Consumer Reports noted that consumers "choose dark chocolate in

---

[14] *Id.*

[15] *Id.*

[16] Kevin Loria, *supra* note 4.

[17] *Id.*

[18] *Id.*

[19] *Id.*

particular for its potential health benefits, thanks to studies that suggest its rich supply of antioxidants may improve heart health and other conditions, and for its relatively low levels of sugar." This is further evidenced by a recent survey from the National Confectioners Association, finding that more than half of the survey participants described dark chocolate as a "better for you" candy.

39. Consumers lack the meaningful ability to test or independently verify whether a product contains lead or other unsafe and unhealthy substances. Therefore, consumers must—and do—rely on Defendants to honestly disclose the contents of their products on their packaging or labels. Indeed, detecting these chemicals requires expensive scientific testing.

40. Defendants have the resources to conduct such testing, however, ████████ ███████████████████████████ **Exhibit D**: MDLZ-000003324. As a result, Defendants know the precise levels of lead in its Products. It also knows such levels are unacceptable to consumers, and that it could take steps to significantly reduce them if they so desired. ███████ █████████████████████████████████████████████████████ **Exhibit E**: MLDZ-000003349.

## III. Defendant Hu Appeals to Consumers Targeted for their Ingredient and Health-Conscious Preferences.

41. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

42. Specifically, ██████████████████████████████████████
████████████████████████████████████████████████████
████████ *See* **Exhibit F**: MDLZ-000007218 at slide 24.



43.    Each category of consumers is uniquely defined,



44.    As Hu recognizes, ██████████████████████████████

████████████████████████████ [20]



45.    This group differs from the regular chocolate-buying market at large. ██████

██████████████████████████████████████████████████████████

██████████████████████████████

46.    In fact, additional market research conducted by Hu shows ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████ [21]    Accordingly, as Hu notes, ██████████████████████

██████████████████████████████████████████████████████████

---

[20] *See* **Exhibit G**: MDLZ-000007068

[21] *See* **Exhibit H**: MDLZ-000006350 Slide 13 (emphasis added).



[22] e.g., Hu's target consumers.

47.    Thus, ██████████████████████████████████████

But, as Hu has found, ████████

[23]

48.    Hu's market research reveals that ████ █ ████████████████

[24]

49.    ████████████████████████████████

██████ .[25]

50.    In short: ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

51.    In fact, when compared against non-Hu ████████████ buyers, Hu's own data

shows that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[26]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[25] *See* **Exhibit J**: MDLZ-000000512

[26] *See* **Exhibit K**: MDLZ-000006289 at slide 107.

52.     None of these results come as a surprise to Hu.  As Hu's own internal studies show, ██████████████████████████████████████████████████████[27]  As discussed above, ████████████████████████████████████████████ ██████████████████████

53.     Thus, Hu understands that it is positioned as a "healthier choice" than competing ████████████ brands.  As Hu recognizes, ████████████████████████████ ████████████████████████████████████████████[28] Accordingly, Hu knows its consumers care even more about the composition of a dark chocolate bar than other Super Premium consumers do.

54.     In other words, the average Hu consumer is *more discerning* than the average ████████ ████████ chocolate consumer, and the average ██████████ consumer is *already* exceedingly health focused.  Further, the average Hu consumer is more exacting than any other consumer of chocolate and does not compromise: the chocolate bar they purchase must be superlative in every single way, and they care significantly more about the ingredients and content of the chocolate than others.  They are precisely the group of consumers who would take the presence or risk of presence of lead into consideration when making their purchasing decisions, even if such content is below California or FDA standards.

## IV.    Defendant Hu's Misrepresentations and Omissions to its Target Consumers Concerning Heavy Metals in its Products

55.     Defendants test their Products for quality control purposes ██████████████ ████████████████████████████████████████████████████

---

[27] **Exhibit L**: MDLZ-000004576 at slide 25.

[28] **Exhibit M**: MDLZ-000000688.

Defendants receive Certificates of Analysis and other certifications from the suppliers of the ingredients used to create the Products. These documents also disclose ████████████ ██████████████████████████████████

56.    Defendants are thus aware of the presence, or risk of presence, of lead in the Products, and had exclusive and superior knowledge of the lead levels in the Products.

57.    Nonetheless, Defendants market Hu Dark Chocolate Bars as some of the highest quality, most health-focused chocolate bars on the market.

58.    Consumers have come to trust Defendants' marketing in their purchasing decisions. By printing on Product labels that the Products contain "ultrasimple ingredients with unbeatable taste,"[29] by a company whose mission is to "get back to the way humans ate before industry ruined food,"[30] Hu consumers are led to believe that the chocolate conforms with their ████████████ expectations despite the presence of lead and other heavy metals.

59.    Indeed, ██████████████████████████████████████ ████████████████████████████[31]

60.    In fact, Hu intentionally positioned itself as a "no compromise" "health and wellness" snack brand. It makes numerous representations that its products are "better-for-you," "clean," "organic," and made with "simple, close to nature ingredients" in contrast to Hu's presumably unhealthy "competition."[32]

---

[29] *See* **Exhibit N**: MDLZ-000006892

[30] *Id.*

[31] **Exhibit O**: MDLZ-000007062 Slide 97.

[32] *See* https://hukitchen.com/pages/about-us#/; https://hukitchen.helpdocs.io/article/k35mbhw sxm-are-all-of-your-products-organic; https://hukitchen.helpdocs.io/article/i0txm3ql16-what-makes-your-chocolate-clean (last accessed Jan. 24, 2023).

61.    Accordingly, Hu's founders tout the company's commitment to a healthy lifestyle and their "strict ingredient guardrails" as the reason and motivation to create Hu Chocolate bars:

> We couldn't find a chocolate that met our standards. So we made our own.
> …
> The [Hu founders] experimented and researched the gut-brain connection, the causes of systemic inflammation, and the impact of certain foods and additives on our health, immunity, and performance. When all was said and done, the answer was pretty clear: replacing weird, industrial ingredients with simple, healthier ones was the key to thriving, not just surviving. Motivated by their health and wellness learnings, they set out to create a food brand that brought to life their newfound passion and human-centric philosophy.
> …
> WE OBSESSIVELY VET EVERY INGREDIENT TO UNITE UNBEATABLE TASTE WITH UNMATCHED SIMPLICITY.[33]

62.    This is why Hu describes its purpose as one to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by using ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[34]



---

[33] *See id.*

[34] **Exhibit F**: MDLZ-000007218 (emphasis added).

63.     Simplicity, as a concept, permeates Hu's branding.  Hu's brand signature, "GET BACK TO HUMAN," and the tagline, "NO WEIRD INGREDIENTS. EVER," coupled with its promise to deliver ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████      This language also tracks to Hu's definitions of ████████████████ and ████████████ groups.[35]

64.     Hu's "simplicity" branding is also clearly evident on its packaging for the Simple Organic Dark Chocolate 70% Cacao bar, which lists only three ingredients: "organic fair-trade cacao, unrefined organic coconut sugar, organic fair-trade cocoa butter."

65.     In fact, both the front and back of Defendants' packaging for the Simple Organic Dark Chocolate 70% Cacao bar also has a long list of undesired ingredients that the Product boastfully does not contain, but fails to disclose the existence of lead:

//

//

//

//

//

//

//

//

//

---

[35] *See* ¶ 47, *supra* ████████████████████████████████████

████████████████████████




66.    Defendants further represented that their Products do not contain any "weird ingredients" at its checkout screen for online orders:



67.    Yet Defendants knew that the consumers they target are uniquely focused on their health and the health of their families.  Hu's consumers, as shown by Hu's own market research, desire to be informed about the potential for lead in the Products.  Defendants' omission of the presence, or risk of presence, of lead is undeniably material.

68.    In fact, any questions about whether the presence of lead in Hu's chocolate is *actually* material to Hu's consumers—and whether they were mislead by its branding and marketing—can be answered by Hu's own consumers following Consumer Reports' finding.  As one consumer wrote to Hu, "[a]s a company who markets a healthier for you chocolate … I'm devastated … that I can't eat it anymore [and] that I found out I've been eating a dangerous heavy metal."[36]

69.    Another consumer, clearly relying on the representations Hu makes to its consumers, asked to confirm that "*your healthy chocolate bar* ha[s] this much lead in it?"[37]

70.    Similarly, another consumer remarked, "I trust your company and standards and would think you guys test for things such as these *especially with your mission*."[38]  Put another way by a different consumer: "I hold H[u] to a very high standard as *[I'd] expect the brand would want since the mission is cleaner ingredients!*"[39]

71.    As shown, consumers expect Hu would abide by its own representations and, as one complaint remarked, "[g]et back to human by keeping lead and cadmium out of [Hu's]

---

[36] **Exhibit P**: MDLZ-000007175.

[37] **Exhibit T**: MDLZ-000007176 (emphasis added).

[38] **Exhibit U:** MDLZ-000007151.

[39] **Exhibit Q**: MDLZ-000007050 (emphasis added)

chocolate."[40]

72.    Thus, although consumers have "been eating [Hu] chocolate bars for a while []
thinking [they were] making a good decision for [their] health with [Hu's] brand,"[41] the "recent
news of heavy metal results [was] devastating, especially coming from a company *[t]hat
advertises as a healthier alternative* to most chocolate."[42]

73.    As demonstrated, Plaintiff and the Class Members reasonably relied to their
detriment on Defendants' misleading representations and omissions, in that Defendants failed to
disclose that the Products contained or risked containing lead despite being aware that their
targeted consumer base comprised of particularly health-conscious consumers.

74.    Defendants' false, misleading, and deceptive misrepresentations and omissions are
likely to continue to deceive and mislead targeted consumers, as they have already deceived and
misled Plaintiff and the Class Members.

75.    In making the false, misleading, and deceptive representations and omissions
described herein, Defendants knew and intended that consumers would pay a premium for the
Products. Had Defendants not made the false, misleading, and deceptive representations and
omissions, Plaintiff and the Class Members would not have been willing to pay the same amount
for the Products they purchased and, consequently, Plaintiff and the Class Members would not
have been willing to purchase the Products.

76.    Plaintiff and the Class Members each paid money for the Products.  However,
Plaintiff and the Class Members did not obtain the full value of the advertised Products due to

---

[40] *Id.*

[41] **Exhibit R**: MDLZ-000007046

[42] **Exhibit S**: MDLZ-000007045 (emphasis added)

Defendants' misrepresentations and omissions.  Plaintiff and the Class Members paid more for the Products than they would have had they known the truth about the Products.  Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendants' wrongful conduct.

## TOLLING

77.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule.  Plaintiff did not know (and had no way of knowing) that the Products contained toxic heavy metals because Defendants kept this information secret.

## CLASS ACTION ALLEGATIONS

78.    Plaintiff brings this matter on behalf of herself and all similarly situated in the following class ("The Class"):

> All United States residents who purchased the Products during the relevant statute of limitations period.

79.    In addition, Plaintiff brings this matter on behalf of herself and all similarly situated in the following class ("The New York Subclass," together, "the Classes"):

> All New York residents who purchased the Products in the State of New York during the relevant statute of limitations period.

80.    Excluded from each of the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

81.    The Class and New York Subclass are properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity,

commonality, typicality, and adequacy because:

82.     The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of the Classes is unknown to Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendants and its agents.

83.     Plaintiff reserves the right to expand, limit, modify, or amend the class definitions, including the addition of one or more Subclass, in connection with their motion for class certification, or at any time, based on *inter alia*, changing circumstances and new facts obtained.

84.     **Numerosity:** Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers in the Class and the New York Subclass who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

85.     **Commonality and Predominance:**  The questions of law and fact common to the Classes which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.     Whether Defendants are responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased their Products;

b.     Whether Defendants breached express warranties relating to the Products;

c.     Whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants had engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

d.     Whether Defendants' false and misleading statements concerning their Products were likely to deceive targeted consumers; and

e.  Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

86.  **Typicality:**  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class and New York Subclass was susceptible to the same deceptive, misleading conduct and purchased Defendants' Products and suffered the same injury.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

87.  **Adequacy of Representation:**  Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this class action. Neither Plaintiff, nor her counsel, have any interests adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiff is able to fairly and adequately represent the interests of the Classes.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Complaint to include Class representatives to represent the Class or additional claims as may be appropriate.

88.  **Superiority:**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the Court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgements, and would magnify the delay and expense to all parties and the court system resulting in multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some

or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in managing this action as a class action.  Class-wide relief is essential to compel compliance with New York law.

## CAUSES OF ACTION

### COUNT I
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of Plaintiff and The Classes)**

89.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

91.    This claim is brought pursuant to the laws of the State of New York.

92.    Defendants are merchants and were at all relevant times involved in the manufacturing, distributing, and/or selling of the Products.

93.    The Products are considered "goods" under the relevant laws.

94.    UCC § 2-313 provides that an express warranty is created when a seller makes: (a) any affirmation of fact or promise which relates to the goods and becomes part of the basis of the bargain; (2) any description of the goods which is made part of the basis of the bargain; or (3) any sample or model which made part of the basis of the bargain.

95.    Defendants expressly warranted through their public advertising and packaging, which presented the Products as free of "weird ingredients," and many other representations of purity and quality control, including their numerous representations that their products are "better-for-you," "clean," "organic," and made with "simple, close to nature ingredients."

96.     These warranties assured Plaintiff and the other Members of the Classes that the Products would be free of "weird ingredients" such as lead and became the basis for the bargain in that Plaintiff and the other Members of the Classes would not have purchased the Products or would have paid less for them than they did had they known the truth about Defendants' Products.

97.     Defendants breached their express warranties because the Products did in fact contain lead.

98.     As a direct and proximate result of Defendant's breach of express warranty Plaintiff and the other Members of the Classes were injured in the amount of the price they paid for the Products, in an amount to be proven at trial.

99.     On February 9, 2023, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a warranty notice letter that complied in all respects with U.C.C. 2-607.  The letter provided notice of breach of express warranties.  The letter advised Defendants that they were in violation of the U.C.C. 2-607 and demanded that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.  A true and correct copy of that letter is attached hereto as **Exhibit A**.

### COUNT II
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and New York Subclass Members)**

100.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

101.    Plaintiff brings this claim individually and on behalf of the New York Subclass Class against Defendants.

102.    This claim is brought pursuant to the laws of the State of New York.

26

103.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

104.    Defendants committed deceptive acts and practices by employing false, misleading, and deceptive representations and/or omissions about the presence (or potential presence) of toxic heavy metals in its Products.

105.    Information as to the heavy metal content of each of its dark chocolate Products was in Defendants' exclusive control.  Plaintiff could not possibly have known that the Products at issue contained toxic heavy metals because such information was not available to the public until late 2022.

106.    Defendants' deceptive acts and practices were directed at consumers.

107.    Defendants' deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were safe to consume regularly and did not contain significantly elevated levels of toxic heavy metals.

108.    Defendants know that health information about its food products is material to consumers.  If such information were not material, Defendants would not market their Products as containing "clean," and "simple," ingredients and lacking "weird ingredients" to its ingredient conscious consumer base.  As a result of its deceptive acts and practices, Defendants sold tens if not hundreds of thousands of dark chocolate Products to unsuspecting consumers across New York.

109.    If Defendants had advertised the Products truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased them or would not have paid as much as they did for them.

110.    As a direct and proximate result of Defendants' false, misleading, and deceptive representations and/or omissions, Plaintiff and other Members of the New York Subclass were injured in that would not have purchased the Product, or would have paid substantially less for it, but for Defendants' misrepresentations and omissions concerning the heavy metal content in the Products.

111.    On behalf of herself and Members of the New York Subclass, Plaintiff seeks to recover her actual damages or fifty (50) dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT III**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the New York Subclass Members)**

112.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

113.    Plaintiff brings this claim individually and on behalf of the New York Subclass Class against Defendants.

114.    This claim is brought pursuant to the laws of the State of New York.

115.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows: False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

116.    N.Y. Gen. Bus. Law § 350-A(1) provides, in part, as follows: "The term 'false advertising,' means advertising, including labeling, of a commodity, or of the kind, character,

terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representation made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual."

117.   Defendants' labeling and advertisements contain untrue and materially misleading statements concerning Defendants' Products inasmuch as they misrepresent the existence of lead in the Products.  By misrepresenting the true contents of the Products, Defendants' marketing and labeling misleads a reasonable consumer.

118.   Defendants had exclusive knowledge of the lead levels in the Products.

119.   Defendants' misrepresentations and omissions were material because consumers are concerned with the safety of food that they purchase, and the ingredients therein.

120.   As a result of Defendant's misrepresentations and omissions, Plaintiff and members of the Subclass have suffered economic injury because they would not have purchased the Products, or would have paid substantially less for it, if they had known that the Products contained heavy metals.

121.   Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

122.   As a result of Defendants' recurring, unlawful deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory damages of $500 per unit

sold, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT III**
**FRAUD**
**(On Behalf of Plaintiff and the Class)**

123.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

124.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

125.    As discussed above, Defendants misrepresented in the Products' advertising that Hu chocolate has "NO WEIRD INGREDIENTS, EVER," and that Hu Products are made with "UltraSimple Ingredients."  Defendants also fail to disclose on the Products' packaging the presence or potential presence of lead in the Products, despite knowing that such information is material to their purchasing audience.

126.    The false and misleading representations and omissions were made with knowledge of their falsehood.  Defendants has conducted extensive consumer surveys and has ████████████████████████████████████  Nonetheless, Defendants continue to sell the Chocolate Bars to unsuspecting consumers using these false and misleading representations and omissions.

127.    Defendants are aware that consumers who purchase the Products are concerned about the presence of heavy metals like lead in dark chocolate.

128.    The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the proposed Class reasonably and justifiably

relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class to purchase the Products.

129.    The fraudulent actions of Defendant caused damage to Plaintiff and members of the proposed Class, who are entitled to damages and other legal and equitable relief as a result.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order certifying the Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class and the New York Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and the New York Subclass;

(b)    For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the New York Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest in all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For an order awarding Plaintiff, the Class, and the New York Subclass their reasonable attorney's fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 15, 2024                    Respectfully submitted,

                                         By: */s/ Max S. Roberts*
                                                Max S. Roberts

                                         **BURSOR & FISHER, P.A.**
                                         Max S. Roberts
                                         1330 Avenue of the Americas, 32nd Floor
                                         New York, NY 10019
                                         Telephone: (646) 837-7150
                                         Facsimile: (212) 989-9163
                                         Email: mroberts@bursor.com

                                         **BURSOR & FISHER, P.A.**
                                         L. Timothy Fisher*
                                         Luke Sironski-White*
                                         1990 North California Boulevard, Suite 940
                                         Walnut Creek, CA  94596
                                         Telephone: (925) 300-4455
                                         Facsimile:  (925) 407-2700
                                         E-Mail: ltfisher@bursor.com
                                                 lsironski@bursor.com

                                         **LAUKAITIS LAW LLC**
                                         Kevin Laukaitis*
                                         954 Avenida Ponce De Leon
                                         Suite 205, #10518
                                         San Juan, PR 00907
                                         T: (215) 789-4462
                                         E-mail: klaukaitis@laukaitislaw.com

                                         **ALMEIDA LAW GROUP LLC**
                                         David S. Almeida (*Pro Hac Vice*)
                                         Elena A. Belov (*Pro Hac Vice*)
                                         849 W. Webster Avenue
                                         Chicago, IL 60614
                                         Telephone: (312) 576-3024
                                         E-mail: david@almeidalawgroup.com
                                                 elena@almeidalawgroup.com

                                         *Pro Hac Vice Forthcoming*

                                         *Attorneys for Plaintiff*